IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § Plaintiff, § § vs. § § PAUL R. MONTGOMERY, JR., MICHAEL D. § FISHER, AND JAMES H. WILLINGHAM, JR., § § Defendants. § § | Civil Action No.: 5:20-cv-00598 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") files this Complaint against Defendants Paul R. Montgomery, Jr. ("Montgomery"), Michael D. Fisher ("Fisher"), and James H. Willingham, Jr. ("Willingham") (collectively "Defendants"), and alleges as follows:

## I.
## SUMMARY

1. From approximately June 2016 through early 2017, Montgomery, Fisher, and Willingham raised at least $2.7 million from approximately 15 investors by offering and selling securities, in the form of joint venture interests in two oil and gas projects. Defendants claimed that they would drill new oil and gas wells and rework existing wells in South Texas. They lured investors with, among other things, promises of 32% investment returns, clear limitations on how they would use investor funds, and representations about Montgomery's (the would-be operator) expertise and qualifications in the oil and gas exploration industry.

2. But Defendants never drilled or reworked a single well for these projects. Defendants knew—but they never disclosed—that title to the mineral rights for most of the contemplated wells was clouded and subject to a court-ordered injunction that effectively

1

precluded the oil and gas projects from moving forward. Contrary to how Defendants disclosed they would use investor proceeds, Defendants spent a significant portion of the investor funds on commissions to salesmen dedicated to soliciting investors. The promised investment returns were, at least, grossly inflated, and the claims about Montgomery's expertise and qualifications were lies. In the end, investors suffered a complete loss of their funds.

3. By committing the acts alleged in this Complaint, Defendants directly or indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate the antifraud provisions of the federal securities laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Further, Montgomery and Fisher also aided and abetted Willingham's violations of these antifraud provisions. Finally, Defendants also violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)] by offering to sell and/or selling unregistered securities.

4. In the interest of protecting the public from any further fraudulent activity and harm, the Commission brings this action against Defendants seeking: (a) permanent injunctive relief; (b) disgorgement of ill-gotten gains; (c) accrued prejudgment interest on those ill-gotten gains; (d) civil penalties; and (e) all other equitable and ancillary relief to which the Court determines the Commission is entitled.

## II.
## JURISDICTION AND VENUE

5. This case involves the offer and sale of joint venture interests in oil and gas projects to investors. These joint venture interests are investment contracts, which are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the

2

Exchange Act [15 U.S.C. § 78c]. Thus, the Court has jurisdiction over this action under Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

6. Defendants directly and/or indirectly made use of the mails or of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this Complaint.

7. Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred within the Western District of Texas, San Antonio Division, including but not limited to Defendants' sales of securities, misrepresentations, acts, practices, transactions, and courses of business. Further, Montgomery and Fisher reside within this Division.

## III.
## DEFENDANTS

1. Defendant Paul Russell Montgomery, Jr., age 44, resides in Bulverde, Texas.

2. Defendant Michael David Fisher, age 40, resides in Canyon Lake, Texas.

3. Defendant James Hurst Willingham, Jr., age 72, resides in Cedar Park, Texas.

## IV.
## RELATED ENTITIES

8. Energon3 was a Texas corporation and a purported oil and gas operator owned by Montgomery. Energon3 was involuntarily dissolved in September 2016 for non-payment of franchise taxes, but Montgomery continued to operate the business under that name. Energon3 purchased the oil and gas leases relevant to this lawsuit in late 2015, and then was listed in offering documents as the operator for both the Navarro and Seguin Projects (defined below).

9. Oil Lease Joint Venture LLC ("OLJV") was an unregistered entity; it was neither a joint venture, nor a limited liability company. Defendants and their sales representatives used the names OLJV and later "Exxpand Energy" (defined below) to market the two oil and gas

projects.

10. Exxpand Energy, LLC ("Exxpand Energy") was a Texas limited liability company. Prior to Exxpand Energy's formation, Defendants and their sales representatives used the names OLJV and later "Exxpand Energy" to market the two oil and gas projects. Willingham served as Exxpand Energy's president. In January 2017, Willingham took steps to officially form Exxpand Energy, LLC as a Texas limited liability corporation.

11. Navarro Phase I, LLC was a Texas limited liability company founded by Willingham, who served as the entity's president. Navarro Phase I, LLC issued the investments in the Navarro Project (defined below).

12. Seguin Development Phase II, LLC was a Texas limited liability company founded by Willingham, who served as the entity's president. Seguin Development Phase II, LLC issued the investments in the Seguin Project (defined below).

## V.
## STATEMENT OF FACTS

13. From approximately June 2016 through early 2017, Montgomery, Fisher, and Willingham raised at least $2.7 million from approximately 15 investors in a fraudulent scheme involving the offer and sale of securities, in the form of joint venture interests in two oil and gas ventures: the Navarro Phase I project (the "Navarro Project") and the Seguin Development Phase II project (the "Seguin Project.") Over the course of the scheme, and as further set forth below, Defendants misrepresented and/or omitted numerous material facts to investors that were fundamental to the nature and risks of the investment offerings.

**A.    The Offerings**

   *1.    The Navarro Project*

14. In the fall of 2015, Willingham and a former business partner decided to delve

into the oil and gas investment space. They chose to use Energon3—Montgomery's Texas-licensed oil and gas operator—to acquire leases in Wilson County, Texas. Willingham and his partner also decided to hire Energon3 to drill four new wells and rework four existing wells located on a group of six leases (the "Scull and Grun Leases") for the Navarro Project, which the group planned as the first of multiple joint venture projects.

15. In April 2016, Willingham, his former partner, Montgomery, and Fisher agreed to hire a salesman to sell units in the Navarro Project using a commission-based compensation structure. In June 2016, the salesman and his sales representatives began soliciting investors for the Navarro Project. During the course of the offering, the sales representatives, with Defendants' knowledge, began using OLJV and, later, "Exxpand Energy" in the marketing materials. Marketing materials identified Willingham as Exxpand Energy's president. To solicit investors, the sales representatives used, among other things, pop-up advertising on websites followed by emails that attached promotional videos. The sales representatives initiated contact with individuals that expressed interest in the oil and gas projects, and provided them with the offering materials. After potential investors were identified, Montgomery and Fisher actively engaged in soliciting investments, each frequently participating in calls with sales representatives and potential investors. Willingham, Montgomery, and Fisher also took investors and potential investors on tours of the Scull and Grun Leases.

16. Between June 2016 and March 2017, Defendants raised approximately $2.4 million from 15 investors for the Navarro Project. Some of the investors were not experienced in oil and gas drilling or investing, and, at the time of their investments, they lacked the experience and knowledge necessary to manage an oil and gas joint venture. Rather, the investors depended entirely on Defendants and their purported expertise and experience in order

to earn profits from the Navarro Project.

### 2. *Navarro Project Offering Materials*

17. Willingham and his former partner created an offering brochure to solicit investors for the Navarro Project. The information in the marketing brochure—which Willingham obtained from Fisher—related primarily to oil and gas leases that Montgomery and Fisher had previously tried to market. The offering brochure contained, among other things, a project summary, a description of the well locations, a use-of-proceeds chart, a description of Energon3's experience and "proven success" as an operator, and biographies of Montgomery and others. Montgomery and Fisher reviewed and approved the marketing brochure prior to its dissemination to investors, and Willingham took no steps to verify that the information provided by Fisher was accurate.

18. Willingham and his former partner used the information contained in the Navarro brochure to create the Navarro private placement memorandum ("Navarro PPM"), which investors and potential investors received prior to investing. According to the Navarro PPM, Navarro Phase I, LLC was seeking to raise $2.52 million by offering 21 joint venture units for $120,000 a unit. The Navarro PPM stated that the joint venture would enter into a turnkey contract and operating agreements with Navarro Phase I, LLC, but no such agreements were ever executed. The Navarro PPM also revealed that the investors were to be virtually powerless. It specified that joint venture interest holders "will have no substantial authority over or involvement in operations."

19. Each Navarro Project investor received a suitability questionnaire and subscription agreement that included provisions specifying that Texas law governed the agreement and that investor subscriptions may be accepted or rejected by Navarro Phase I, LLC in its absolute discretion.

20. Navarro Phase I, LLC claimed that sales of the units were exempt from registration pursuant to the Commission's Rule 506(c) under the Securities Act [17 CFR § 230.506], which requires, among other things, that investors meet certain accreditation requirements. However, Defendants and their sales representatives relied only on investor representations in subscription agreements to determine whether the investors were accredited. They took no other reasonable steps to verify investors' accredited status. Not surprisingly, some of the Navarro Project investors were unaccredited.

### 3. *The Seguin Project*

21. In early 2017, Defendants and their sales representatives began soliciting investors for the second phase of their oil and gas investment scheme—the Seguin Project. According to the Seguin Project private placement memorandum ("Seguin PPM"), Seguin Development Phase II, LLC, the manager of the Seguin Project, was seeking to raise $3,360,000 by offering 24 joint venture interest units for $140,000 a unit. The Seguin Project's stated objective was to rework six existing wells and drill four new wells on the same Scull and Grun leases that were part of the Navarro Project.

22. The Seguin PPM, over which Willingham had ultimate authority, was very similar to the Navarro PPM, including specific representations about how investor proceeds would be used. The Seguin PPM also included statements about the joint venture entering into a turnkey contract and operating agreements, but again no such agreements were ever executed. Like the Navarro PPM, the Seguin PPM also revealed that the investors were to be virtually powerless. It specified that joint venture interest holders "will have no substantial authority over or involvement in operations."

23. Of the $3,360,000 they sought to raise, Defendants only raised $280,000 from a single investor who originally invested in the Navarro project and later decided to invest money

into the Seguin project based on misrepresentations about the success of the Navarro project.

**B.     Scull Lease Litigation**

24.     Prior to soliciting investors in either project, Defendants were aware that the mineral interests on many of the contemplated oil and gas wells included in the Navarro and Seguin projects were clouded by ongoing litigation between, among others, Montgomery's company (Energon3) and the land owners: *Scull Ranch, Ltd., et al. v. Metco Oil Corp., et al.*, Cause No. 15-11-0690-CVW in the 218th District Court of Wilson County, Texas (the "Scull Lease Litigation"). On November 23, 2015—just days after Energon3 acquired the Scull and Grun Leases—the mineral rights lessor obtained a temporary restraining order against Energon3, Montgomery, "those acting in concert with" Energon3, and others, enjoining them from exploring, producing, or performing workover operations on four of the six leases in the Navarro Project.[1]

25.     Prior to acquiring the Scull leases for the Navarro and Seguin Projects, Montgomery was aware of title problems that formed the basis of the Scull Lease Litigation and the injunction. Fisher and Willingham learned of the title issues before they received funds from investors in the Navarro Project. Despite this knowledge by Defendants, no one told any investors or prospective investors about the lease injunctions or title issues until April 2017. Instead, Montgomery and Willingham decided that the eight wells would be drilled and reworked on only the Grun lease, a limitation that was not disclosed to investors or prospective investors. Ultimately, Montgomery failed to drill or rework *any* wells on *any* of the project leases.

---

[1] Prior to the expiration of the temporary restraining order, Energon3 agreed to a modified injunction that prohibited drilling of new wells on the affected leases and required notice to the landholders of any workover operations on those leases. That agreement remained in effect until April 16, 2018, when an agreed final judgment was entered against Energon3, Montgomery, "those acting in concert with" Energon3, and others releasing the leases and awarding money to the property owners for damages to the wells, leases, and surface property.

**C. Material False and Misleading Statements and Omissions**

26. Defendants deceived investors about key aspects of the projects, including ownership of the leases, the use of investor proceeds, Montgomery's credentials, investment returns, and various other elements of the projects and the offerings.

### 1. *Ownership of the Scull and Grun Leases*

27. The Navarro and Seguin PPMs represented that investor funds would be used to purchase the Scull and Grun Leases and that the managers of the Navarro and Seguin Projects would not commit investor funds to the project unless the company "was satisfied that it would obtain title to the Leases sufficient to withstand any adverse claim of ownership that might or could be asserted."

28. Defendants knew that this representation was false. Energon3 never transferred the leases to the Navarro and Seguin Projects or their managers. As a result, neither the Navarro and Seguin Projects nor their managers ever actually owned the project leases. Moreover, Energon3—much less the Navarro and Seguin Projects—never had clear title to four of the six leases because of the Scull Lease Litigation. Thus, according to the representations in the Navarro and Seguin PPMs, Defendants never should have spent any of the investor funds until they resolved the critical impediment to the oil and gas exploration objective.

### 2. *Use of Proceeds*

29. The Navarro PPM specifically itemized the project's estimated costs and use of proceeds, which are summarized as follows:

| Navarro Project (PPM Disclosures) | PPM Estimated Costs Disclosure | Percentage |
|---|---|---|
| Purchase of Leases & Existing Wells | $151,200 | 6% |
| Drilling, Completion, Geology, Surveying, Engineering & Site Preparation | $1,990,800 | 79% |
| Management & Administrative Fee | $252,000 | 10% |
| Legal, Accounting, Printing & Organizational Costs | $126,000 | 5% |
| **Total** | **$2,520,000** | |

30. However, instead of spending 85% of investor funds on oil-and-gas-related expenses, Defendants spent no more than $150,000 of the investors' $2.4 million on the wells assigned to the Navarro Project. Instead, Willingham distributed the investor funds as follows:

- $793,000 (or 33%) in commissions to the sales representatives;
- $936,000 (or 39%) to Montgomery/Energon3;
- $221,000 (or 9%) in payments to or on behalf of Willingham; and
- $450,000 (or 19%) as a return of investment funds to a single investor.

31. The use-of-proceeds sections in the Navarro PPM did not allocate the use of *any* investor funds to pay sales commissions. Yet, 33% of the proceeds were used for that undisclosed purpose. Moreover, the majority of investor funds that Willingham sent to Montgomery and Energon3 were not used for the purposes disclosed in the Navarro PPM. Of the $936,000 that Willingham sent to Montgomery for work on the leases, Montgomery in turn paid Fisher's company approximately 38% of those funds, presumably for Fisher's work on the offering documents, marketing materials and videos, and sales efforts.

32. Similarly, Defendants represented that $2.86 million, or 84%, of the investor funds raised for the Seguin Project would be used for oil-and-gas-related costs. Willingham never used *any* of the investor funds for such expenses. Instead, Willingham spent the $280,000 that was raised as follows:

- $25,000 (or 9%) to a sales agent;
- $165,000 (59%) to Montgomery/Energon3; and
- $90,000 (32%) to Willingham.

### 3. *Montgomery's Credentials*

33. Based on information supplied by Montgomery and Fisher, the Navarro PPM, marketing materials, videos, and oral representations by Willingham, Fisher, and others touted the qualifications, experience, and expertise of Montgomery and Energon3, including crediting Montgomery with education and expertise that he did not receive or possess. The Navarro PPM, which was reviewed and approved by Willingham, stated that Montgomery had a Bachelor of Science in Geology from Texas A&M University. Similarly, other marketing materials consistently stated that Montgomery had a degree from Texas A&M University, as well as one from the University of Texas. However, Montgomery never attended *either* university. In fact, Montgomery only took two college courses at a community college and has no qualifications as a geologist or geophysicist.

34. The Navarro offering brochure touts that Energon3 has "extensive experience in both drilling new wells and reworking existing wells" and "their new-drill wells have an average IP of 50 BOPD," suggesting a strong production rate. The brochure also touts that Energon3 holds "the field record for well production rates." These statements are false, which Defendants knew or were severely reckless in not knowing. According to data available from the Texas Railroad Commission, Energon3 has a poor production history.

35. The Navarro marketing brochure also stated that the "Energon3 team has decades of experience in secondary well production in both water and gas injection techniques." This statement is also false. According to Energon3's chief drilling engineer, Energon3 had *no*

11

experience with injection techniques and Montgomery had little hands-on experience with oil and gas wells and leases. Further, both Fisher and Montgomery were aware that Montgomery and Energon3 had little or no success in two recent prior offerings—one of which involved the exact same leases later used in the Navarro and Seguin Projects.

    *4.*    ***Baseless Investment Returns***

36. Defendants' sales representatives touted wholly unsupported projected returns on the Navarro Project, sometimes promising an annual return of 32%—a number Montgomery and Fisher baselessly concocted. The sales representatives also sent potential investors videos promoting the Navarro Project, at least one of which stated the investment was "low-risk" and "[t]he only Realistic way to make a Guaranteed 32.278% on a Single 'Asset Backed' Investment." Prior to investing, several investors also received emails describing the 32% return as a "worse case" scenario. Given Montgomery's poor performance in two of his offerings immediately preceding the Navarro Project, there was no reasonable basis on which to project 32% annual returns. Furthermore, the Scull Lease Litigation proved to be an additional hurdle for Energon3 to produce any returns, let alone returns of 32% (or higher).

    *5.*    ***Other Misrepresentations and Deceptions***

37. Defendants, directly and through their sales representatives, used various other misrepresentations and deceptions to lure investors into the Navarro and Seguin Projects.

    *a.*    <u>Tours</u>

38. Several investors visited Texas, where Defendants escorted them on tours of the Scull and Grun Leases. Willingham and Montgomery showed at least one investor the leases and a purported Navarro well, without disclosing the lease title issues. Shortly after the tour, the investor purchased a unit in the Navarro Project and another existing investor made an additional investment after his tour.

### b. *Promotional Videos*

39. The sales representatives also sent potential investors links to various videos that were rife with misleading information and created a false impression about the Navarro and Seguin Projects. In 2016, Fisher, with Willingham's and Montgomery's participation and assistance, created various promotional videos. Fisher and the sales representatives edited the video and then sent it to investors. Fisher filmed the video footage, which featured, among other things, Montgomery discussing the projects and the Scull and Grun Leases. Fisher narrated several of the short videos. The videos also included shots of what purportedly were wells on the Navarro and Seguin Project leases that were pumping oil and of alleged investors visiting the wells.

40. In truth, wells on the pertinent leases had little production. One video showed a potential investor visiting the Navarro project, and speaking with Montgomery, Fisher, and Willingham about the wells. Sales representatives told several investors that this potential investor invested in two units the day he visited—in fact, he never purchased any units.

41. Another video sent to potential investors and posted on Exxpand Energy's website and on YouTube contained numerous misrepresentations and deceptions. This 12-minute promotional video was partially filmed and edited by Fisher, and Montgomery and Willingham both appeared in it. The video showed, among other things, Defendants, individuals labeled as potential investors, and several Exxpand Energy employees touring an oil field. The video featured several interviews, including one of an individual described as having "invested over $150K before coming on the trip"—in reality, this person was a sales representative for the Navarro and Seguin Projects, who had *not* invested. Another individual interviewed in the video was described as a "professional investor," but he was actually Defendants' IT professional, who never invested. Other individuals labeled as "potential investors" in this video were Fisher's

13

sister-in-law and her parents, who also never invested in the projects.

42. The sales representatives sent a third professionally narrated video to potential investors. The video was also posted on Exxpand Energy's website. This video touted projected returns and the safety of an investment in Exxpand Energy projects. Although Defendants did not create or participate in this video, it was based at least in part on information provided by Defendants. For example, Montgomery and Fisher were the source for claims in the video that investing in the Navarro and Seguin Projects would yield 32% returns. In reality, the Navarro Project was a disaster—there was no reasonable basis to project 32% returns. Defendants took the proceeds and failed to drill any new wells or perform any significant work on the existing wells.

**D. Registration with the Commission**

43. Neither the Navarro Project nor the Seguin Project or their respective securities are or were ever registered with the Commission.

**VI.**
**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

*Against All Defendants*

44. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

45. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or by use of the mails, or of any facility of any national securities exchange, knowingly or severely recklessly:

a. employed devices, schemes, and artifices to defraud; and/or

b. made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c. engaged in acts, practices, and courses of business which operated as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

46. By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## SECOND CLAIM FOR RELIEF
**Aiding and Abetting Violations of the Antifraud Provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]**

*Against Montgomery and Fisher*

47. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

48. By engaging in the acts and conduct alleged herein, Montgomery and Fisher aided and abetted Willingham's violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by knowingly or recklessly providing substantial assistance to Willingham who, directly or indirectly, singly or in concert with others, in the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce or by use of the mails made untrue statements of material facts, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49. By reason of the foregoing, Montgomery and Fisher, directly or indirectly, aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## THIRD CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

*Against All Defendants*

50. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

51. By engaging in the acts and conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, have:

   a. knowingly or with severe recklessness employed a device, scheme, or artifice to defraud; and/or

   b. knowingly, recklessly, or negligently obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

   c. knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

52. By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of the Antifraud Provisions of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**

*Against Montgomery and Fisher*

53. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

54. By engaging in the acts and conduct alleged herein, Montgomery and Fisher aided and abetted Willingham's violations of Section 17(a)(2) of the Securities Act by knowingly or recklessly providing substantial assistance to Willingham who, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. By reason of the foregoing, Montgomery and Fisher, directly or indirectly, aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
**Violations of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)]**

*Against All Defendants*

56. Plaintiff re-alleges and incorporates paragraphs 1 through 43 of this Complaint by reference as if set forth verbatim in this Claim.

57. By engaging in the conduct described herein, Defendants, directly or indirectly, singly or in concert with others:

  a. made use of the means or instruments of transportation or communication in

interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement was in effect; and/or

b. made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement had been filed.

58. By engaging in the conduct described above, Defendants have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

1. Permanently enjoining Defendants from violating Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a) and (c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

2. Permanently enjoining Montgomery and Fisher from aiding and abetting future violations of Section 17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)];

3. Ordering Defendants to disgorge ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

4. Imposing civil penalties against Defendants pursuant to Section 20(d) of the

Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein; and

5.  Imposing such other and further relief as the Commission may show itself entitled.

Dated: May 18, 2020                    Respectfully submitted,

                                         *Jason P. Reinsch*
Jason P. Reinsch
Texas Bar No. 24040120
United States Securities and Exchange Commission
Fort Worth Regional Office
801 Cherry Street, Suite 1900
Fort Worth, Texas 76102
(817) 900-2601 (phone)
(817) 978-4927 (facsimile)
reinschj@SEC.gov

ATTORNEY FOR PLAINTIFF SECURITIES
AND EXCHANGE COMMISSION